Jeffrey Keith Sandman
LA Bar No. 39073, *pending pro hac vice*
Webb Daniel Friedlander LLP
5208 Magazine St Ste 364
New Orleans, LA  70115
Phone: (978) 886-0639
e-mail: jeff.sandman@webbdaniel.law

D. Gill Sperlein
CA Bar No. 172887, pending *pro hac vice*
The Law Office of D. Gill Sperlein
345 Grove Street
San Francisco, CA  94102
Phone: 415-404-6615
e-mail: gill@sperleinlaw.com

Jerome Mooney
SBN 2303
Weston, Garrou & Mooney
50 West Broadway, #300
Salt Lake City, Utah  84101
Phone: 801-364-5635
e-mail: jerrym@mooneylaw.com

ATTORNEYS FOR PLAINTIFFS

# UNITED STATES DISTRICT COURT
# DISTRICT OF UTAH

|  |  |
|---|---|
| FREE SPEECH COALITION, INC.; D.S. DAWSON; JOHN DOE; DEEP CONNECTION TECHNOLOGIES, INC.; CHARYN PFEUFFER; and JFF PUBLICATIONS, LLC,<br><br>        Plaintiffs,<br><br>    v.<br><br>JESS L. ANDERSON, in his official capacity as THE COMMISSIONER OF THE UTAH DEPARTMENT OF PUBLIC SAFETY; and SEAN D. REYES, in his official capacity as THE ATTORNEY GENERAL OF THE STATE OF UTAH,<br><br>        Defendants. | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>JURY DEMANDED<br><br>CASE NO.: ____<br><br>JUDGE: _____ |

Plaintiffs, by their undersigned attorneys, allege as follows:

## INTRODUCTION

1. Here we are again. After numerous federal court decisions invalidating as unconstitutional state and federal laws seeking to regulate or ban the publication of material harmful to minors on the internet, the Utah legislature has tried once more. The new law ("the Act") places substantial burdens on Plaintiff website operators, content creators, and countless others who use the internet by requiring websites to age-verify every internet user before providing access to non-obscene material that meets the State's murky definition of "material harmful to minors." Specifically, and in relevant part, the Act provides that a "commercial entity that knowingly and intentionally publishes or distributes material harmful to minors on the Internet from a website that contains a substantial portion of such material shall be held liable if the entity fails to perform reasonable age verification methods to verify the age of an individual attempting to access the material." UTAH CODE ANN. § 78B-3-1002. A commercial entity in violation "shall be liable to an individual for damages resulting from a minor's accessing the material, including court costs and reasonable attorney fees as ordered by the court." *Id.*

2. Pursuant to 18 U.S.C. § 2201 and 2202, and 42 U.S.C. § 1983 and 1988, this action seeks declaratory and injunctive relief to vindicate rights, privileges, and immunities secured by the Constitution and laws of the United States. The Act violates the First and Fourteenth Amendments to, and the Commerce and Supremacy Clauses of, the United States Constitution, because it impermissibly burdens Plaintiffs' exercise of their rights thereunder in myriad ways.

3. The Act violates the First Amendment in several respects. First, it imposes a content-based restriction on protected speech that requires narrow tailoring to serve a compelling state interest, yet it does not substantially accomplish its stated purpose of protecting minors from so-called "harmful" material that they may easily obtain from other sources and via other means. Second, compelling providers of online content to place an age-verification content wall over their entire websites unconstitutionally labels them as "adult businesses," with all the negative implications and ramifications that follow. And third, by requiring the use of some particularized approval method as a condition to providing protected expression, the Act operates as a presumptively-unconstitutional prior restraint on speech.

4. The Act violates the Fourteenth Amendment in myriad ways, too. First, because it fails to provide a person of ordinary intelligence fair notice of to whom the Act applies, what is required, and what is prohibited, the Act is thus impermissibly vague, violating the procedural component of the Due Process Clause. Second, the Act intrudes upon fundamental liberty and privacy rights without being properly tailored to serve the government's interest, thus violating the substantive component of the Due Process Clause. Third, the Act's exemption of certain news organizations draws impermissible content-based distinctions among persons engaged in free speech, violating the Equal Protection Clause.

5. The Act also significantly burdens interstate commerce by restricting the ability of providers of online content to communicate with Utah residents. This burden is clearly excessive in comparison to the limited local benefit provided by the Act and the availability of less restrictive alternative means of protecting children from erotic content.

6.   Finally, by treating website operators as the publishers of material hosted on their websites but produced by other content providers, the Act stands in direct conflict with 47 U.S.C. § 230 ("Section 230") and is therefore preempted by that supreme federal law.

7.   This attempt to restrict access to online content is not novel. The United States Supreme Court invalidated a federal law restricting internet communications deemed harmful to minors on First Amendment grounds in *Reno v. ACLU*, 521 U.S. 844 (1997). The Third Circuit invalidated a second such federal law on First Amendment grounds in *ACLU v. Mukasey*, 534 F.3d 181 (3rd Cir. 2008), *cert. denied*, 555 U.S. 1137 (2009). And in state after state, laws containing content-based restrictions on internet communications deemed harmful to minors have been held unconstitutional.[1]

8.   Despite this long legacy of constitutional invalidity, the Utah State Legislature enacted the Act and the Governor signed it into law—rendering it effective on May 3, 2023. Now, providers (including Plaintiffs) are in the untenable position of abiding by the Act's terms and enduring the constitutional infringement, or violating the Act and risking lawsuits.

---

[1] *See, e.g., Garden Dist. Book Shop, Inc. v. Stewart*, 184 F. Supp. 3d 331 (M.D. La. 2016) (Louisiana), *American Booksellers Foundation v. Sullivan*, 799 F. Supp. 2d 1078 (D. Alaska 2011) (Alaska), *American Booksellers Foundation v. Coakley*, 2010 WL 4273802 (D. Mass. 2010) (Mass.); *PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) (Virginia), *American Booksellers Foundation v. Dean*, 342 F.3d 96 (2d Cir. 2003) (Vermont), *Cyberspace Communications, Inc. v. Engler*, 238 F.3d 420 (6th Cir. 2000) (Michigan), *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) (New Mexico), *ACLU v. Goddard*, Civ. 00- 0505 (D. Ariz. Aug. 11, 2004) (Arizona), *Southeast Booksellers v. Ass'n v. McMaster*, 282 F. Supp. 2d 389 (D.S.C. 2003) (South Carolina), *American Library Association v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997) (New York).

9.  As such, Plaintiffs seek to have the Act declared unconstitutional and void, and to have Defendants enjoined from enforcing it—both preliminarily, pending the hearing and determination of this action, and permanently.

## JURISDICTION AND VENUE

10. This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3). It seeks remedies under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and Fed. R. Civ. P. 65.

11. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this district.

## PARTIES

12. Plaintiff Free Speech Coalition, Inc. (FSC) is a not-for-profit trade association incorporated under the laws of California with its principal place of business in Canoga Park, CA. FSC assists film makers, producers, distributors, wholesalers, retailers, internet providers, performers, and other creative artists located throughout North America in the exercise of their First Amendment rights and in the vigorous defense of those rights against censorship. Founded in 1991, the Free Speech Coalition currently represents hundreds of businesses and individuals involved in the production, distribution, sale, and presentation of constitutionally-protected and non-obscene materials that are disseminated to consenting adults via the internet. Most of that material would fit within Utah's statutory definition of "material harmful to minors." The Free Speech Coalition sues on its own behalf and on behalf of its members to vindicate its own constitutional rights, its members' constitutional rights, and

those of their owners, officers, employees, and current and prospective readers, viewers, and customers.

13. Plaintiff D.S. Dawson[2] is a 30-year-old man born in Provo, UT and currently living in Pleasant Grove, UT. He graduated with a degree in Finance from Utah Valley University and worked for Goldman Sachs for five years in various roles (most recently, as an investment banking analyst in New York City). He returned to Utah and joined a renewable energy startup as a financial analyst until the company was acquired, after which he managed his own investment portfolio for a short time through a volatile market. Dawson began writing gay erotica as a hobby in 2020 but transitioned to full-time writing in the late Fall of 2022. He writes under three pennames, each confined to a different subgenre—one for rough gay BDSM, another for gay erotica influenced by Japanese anime-culture, and the third for romantic gay erotica (read mostly by straight women). His stories are sold as e-books and paperbacks on Amazon, and for several months, he has used AI voice synthesis software to offer his BDSM titles in audio format. These audiobooks are sold on e-commerce platform Gumroad, and he drives traffic to this site by posting previews on adult sites PornHub and xHamster (promotion that he credits with nearly all of his audiobook sales to date). He plans to adapt his other titles to audio format soon. As nobody else on the internet is producing gay erotica as AI-read audiobooks, the audio format is a way for Dawson to reach a new audience, including customers who are blind. Because PornHub has shut down access to Utahns, Dawson has been unable to access his own account and intends to buy a VPN

---

[2] Dawson is one of several pen names under which the Plaintiff publishes his work. He will file with the court a motion to proceed pseudonymously.

subscription as an end-around. The Act has Dawson concerned about the viability of his small business.

14. Plaintiff John Doe[3] is a 74-year-old attorney who moved to Utah in 1966 to attend Brigham Young University, where he majored in Political Science and Sociology. He later earned his law degree from the University of Utah College of Law and has practiced law in Utah ever since. He is a member of the New York and Utah Bar Associations, and he is admitted to the United States Tax Court, the Tenth Circuit Court of Appeals, and the United States Supreme Court. As part of his legal practice, Doe represents various adult bookstores and sexual device manufacturers, which requires that he occasionally visit websites that contain a substantial portion of material that may be deemed "harmful to minors" under the Act. Thus, the law requires Doe to provide verified identification to access those websites. He finds such a requirement repugnant to his core values of privacy and freedom. And because Utah's only digital identification card does not offer online verification capabilities, he currently has no way to access those sites at all.

15. Plaintiff Deep Connection Technologies Inc. (DCT) is a business corporation organized under the laws of Delaware with its principal place of business in San Francisco, CA. DCT operates O.school, a judgment-free online educational platform focused on sexual wellness. Andrea Barrica, O.school's founder and CEO, is a queer woman of color who has grown O.school to reach more than 25 million people globally, 4.2 million across the United States, and 39,000 across Utah. O-school's mission is to help people worldwide improve their sexual health, power, and confidence. Previously, Barrica co-founded inDinero.com, the leading

---

[3] John Doe is a pseudonym. He will file with the court a motion to proceed pseudonymously.

financial solution for growing startups, and served as a partner at 500 Startups, a global venture capital fund where she worked with hundreds of startup companies. Barrica was raised in a religious, conservative Filipino family that preached abstinence, and she received only fear-based sex education in public schools. Seeking support and information about sex and sexuality, Barrica was unable to find reliable resources online, leading her to launch O.school in 2017 in order to change the way people learn about sexuality. She is the author of Sextech Revolution: The Future of Sexual Wellness, and she is a professional speaker, having presented for TED Unplugged, SXSW, the Women in Tech Festival, UN Women, Planned Parenthood, and others. Barrica fears that O.school contains a "substantial portion" of content that meets the statutory definition of "material harmful to minors." As she believes that O.school provides critical sex education that is appropriate (and necessary) for older minors, she opposes any age-verification measure that would preclude those teens from accessing O.school's content.

16. Plaintiff Charyn Pfeuffer (Pfeuffer) is a 50-year-old woman living in Seattle, WA. She has written professionally about sex and relationships for 25 years and has been creating online sexual content for three. Pfeuffer's writings have been published by sites that do not contain a "substantial portion" of "material harmful to minors" (like Refinery29, Thrillist, Fodor's The Daily Dot, Men's Health), as well as some sites that very well might (like Kinkly). She archives her written work in an online portfolio and shares it via her social media platforms, working around the blunt censorship filters (*e.g.,* by substituting words like "seggs" for "sex"). More recently, through her online video sex work, she has discovered an endless array of fans seeking someone to speak with, including committed partners interested in

exploring a particular fantasy before bringing it into their real world relationships; seniors looking for light flirtation; recently single men and women looking for consolation; psychologically isolated people (especially active-duty and former military personnel) who have been failed by traditional support systems; and those pursuing basic sexual education, including what lubricants to buy (and when to use them), how to perform oral sex, and how to talk about consent and establish boundaries. On webcam sites OnlyFans and SextPanther, much of Pfeuffer's content meets the statutory definition of "material harmful to minors," and although Pfeuffer is fastidious about ensuring that her fans are adults, she worries that her low-tech efforts do not meet the definition of "reasonable age verification methods."

17. Plaintiff JFF Publications, LLC (JFF) is a limited liability company organized under the laws of Delaware with its principal place of business in Broward County, FL. It has one Member, a natural person who is a citizen of Florida. JFF operates an internet-based platform at the domain <JustFor.Fans> that allows independent producers/performers of erotic audiovisual works to publish their content and provide access to fans on a subscription basis. Each producer/performer operates and maintains an individual JustFor.Fans channel, which may contain photographs or videos and permits the exchange of messages between producers/performers and fans. JFF developed and continues to enhance the software and features that drive the JFF platform, it arranges third-party billing capabilities, and it otherwise maintains the platform. Although it develops and implements advertising and marketing plans for the platform, many of the independent producers/performers selling subscriptions on the platform implement their own marketing plans to drive customers to their specific JFF channel. Most often, producers/performers maintain a social media

presence through which they encourage their fans to purchase a subscription to their JustFor.Fans channel, sometimes providing a direct link to the JFF platform. JFF is confused about what constitutes "reasonable age verification methods" required by the Act and concerned about the costs of compliance.

18. Defendant Jess L. Anderson is the Commissioner of Utah's Department of Public Safety, which includes the Driver License Division (DLD).[4] The DLD manages Utah's Mobile Driver's License (mDL) Program, which provides an official copy of a user's driver license or identification card to his or her mobile device.[5] Users may download the application from public app stores and visit a DLD office to have their identity verified and their mDL provisioned directly into that app, or they may perform an at-home self-registration pursuant a process outlined by the DLD.[6] The "reasonable age verification methods" required by the

---

[4] *See* https://dpsadmin.utah.gov/commissioners/commissioner-jess-l-anderson/.

[5] *See* https://dld.utah.gov/utahmdl/.

[6] *See* https://dld.utah.gov/mdlfaqs/, which explains:

> The license holder will: (1) download the app from the app store and then (2) confirm your mobile number and email and then (3) scan the 2D barcode on the back of the license and then (4) take a selfie and do a liveness detection. If the selfie matches the photo previously taken at a Driver License office and if the data on the back of the license matches the valid data in the Driver License database, then the license will be provisioned onto the phone.
>
> The mDL data has been signed by Utah DLD when provisioned to your device. That digital signature makes it an official document that you control. The system uses the private keys on your device to encrypt each data element and ensure that only you can use it and share data. No other entity can access or read the mDL data without your consent.
>
> A relying party (i.e., a business, restaurant, bank, etc.) will have a verifier app that contains a public key from all trusted issuers (such as Utah DLD.) The verifier receives encrypted data from you and authenticates that data with the correct public key. This ensures that the mDL data is authoritative (comes from the DLD), has not been altered, and was issued to you. If all the data elements you shared match, the credential is verified. If there has been any tampering or

Act are explicitly satisfied where "the person seeking to access the material" is prompted to provide "a digitized identification card." Section 78B-3-1001(2). Utah's Mobile Driver's License (mDL) Program provides the only qualifying "digitized identification card," but it does not yet provide for the *online* verification necessary for the card to be of any use to putative providers and viewers of "material harmful to minors" online.

19. Sean D. Reyes is the Attorney General of the State of Utah. In that capacity, he "shall be the legal adviser of the State officers, except as otherwise provided by this Constitution, and shall perform such other duties as provided by law." UTAH CONST. Art. VII, § 16. Among those other duties, the "Attorney General shall . . . prosecute or defend all causes to which the state or any officer, board, or commission of the state in an official capacity is a party, and take charge, as attorney, of all civil legal matters in which the state is interested[.]" UTAH CODE ANN. § 67-5-1(1)(b).

**FACTS**

**I.        Communication Over the Internet**

20. The internet is a decentralized, global medium of communication that links people, institutions, corporations, and governments around the world. It is a giant computer network that interconnects innumerable smaller groups of linked computer networks and individual computers. The internet connects an estimated 5.39 billion people—or 68% of the world's population, and in Utah, it is estimated that 84.4% of residents are internet users.[7]

---

changes to the data, it will not be verified. The relying party can then approve your transaction.

[7] *See* http://www.internetworldstats.com/stats.htm;
https://www.statista.com/statistics/184691/internet-usage-in-the-us-by-state/.

21. Because the internet merely links together numerous individual computers and computer networks, no single entity or group of entities controls the material made available on the internet or limits the ability of others to access such materials. Rather, the range of digital information available to internet users is individually created, maintained, controlled, and located on millions of separate individual computers around the world.

22. The internet presents extremely low entry barriers to anyone who wishes to provide or distribute information or gain access to it. Unlike television, cable, radio, newspapers, magazines or books, the internet provides the average citizen and business, whether large or small, with an affordable means for communicating with, accessing, and posting content to a worldwide audience "with a voice that resonates farther than it could from any soapbox." *Reno*, 521 U.S. at 870. Although the majority of the information on the internet does not depict or describe nudity or sexual activity, such material is indeed widely available on the internet.

23. An Internet Protocol (IP) address is a unique address that identifies a connection to a device on the internet or a local network, much like a telephone number is used to connect a telephone to other telephones. In essence, an IP address is the identifier that allows information to be sent between devices on a network. Internet Service Providers (ISPs) and telecommunications companies control blocks of IP addresses, and the location of an internet connection can be roughly determined according to the geo-location those companies assigned the IP address associated with a connection.

24. A Virtual Private Network (VPN) functions as an intermediary between an individual computer and the targeted server. It hides the user's actual public IP address and instead

"tunnels" traffic between the user's device and a remote server. Setting up a VPN is free and simple, and doing so permits users to hide their location while browsing the web.

## II.     The Act

25. In 2023, the Utah State Legislature enacted, and Governor Spencer Cox signed into law, S.B. 287 (the Act), codified at Sections 78B-3-1001 and 78B-3-1002 of the Utah Code. The operative provisions of the Act are as follows:

78B-3-1001. Definitions.

As used in this chapter:

(1) "Commercial entity" includes corporations, limited liability companies, partnerships, limited partnerships, sole proprietorships, or other legally recognized entities.

(2) "Digitized identification card" means a data file available on any mobile device which has connectivity to the Internet through a state-approved application that allows the mobile device to download the data file from a state agency or an authorized agent of a state agency that contains all of the data elements visible on the face and back of a license or identification card and displays the current status of the license or identification card.

(3) "Distribute" means to issue, sell, give, provide, deliver, transfer, transmute, circulate, or disseminate by any means.

(4) "Internet" means the international computer network of both federal and non-federal interoperable packet switched data networks.

(5) "Material harmful to minors" is defined as all of the following:

(a) any material that the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;

(b) material that exploits, is devoted to, or principally consists of descriptions of actual, simulated, or animated display or depiction of any of the following, in a manner patently offensive with respect to minors:

(i) pubic hair, anus, vulva, genitals, or nipple of the female breast;

(ii) touching, caressing, or fondling of nipples, breasts, buttocks, anuses, or genitals; or

(iii) sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, excretory functions, exhibitions, or any other sexual act; and

(c) the material taken as a whole lacks serious literary, artistic, political, or scientific value for minors.

(6) "Minor" means any person under 18 years old.

(7) "News-gathering organization" means any of the following:

(a) an employee of a newspaper, news publication, or news source, printed or on an online or mobile platform, of current news and public interest, while operating as an employee as provided in this subsection, who can provide documentation of such employment with the newspaper, news publication, or news source; or

(b) an employee of a radio broadcast station, television broadcast station, cable television operator, or wire service while operating as an employee as provided in this subsection, who can provide documentation of such employment.

(8) "Publish" means to communicate or make information available to another person or entity on a publicly available Internet website.

(9) "Reasonable age verification methods" means verifying that the person seeking to access the material is 18 years old or older by using any of the following methods:

(a) use of a digitized information [sic] card as defined in this section;

(b) verification through an independent, third-party age verification service that compares the personal information entered by the individual who is seeking access to the material that is available from a commercially available database, or aggregate of databases, that is regularly used by government agencies and businesses for the purpose of age and identity verification; or

(c) any commercially reasonable method that relies on public or private transactional data to verify the age of the person attempting to access the material.

(10) "Substantial portion" means more than 33-1/3% of total material on a website, which meets the definition of "material harmful to minors" as defined in this section.

(11) (a) "Transactional data" means a sequence of information that documents an exchange, agreement, or transfer between an individual, commercial entity, or third party used for the purpose of satisfying a request or event.

(b) "Transactional data" includes records from mortgage, education, and employment entities.

Section 2. Section 78B-3-1002 is enacted to read:

78B-3-1002. Liability for publishers and distributors -- Age verification -- Retention of data -- Exceptions.

(1) A commercial entity that knowingly and intentionally publishes or distributes material harmful to minors on the Internet from a website that contains a substantial portion of such material shall be held liable if the entity fails to perform reasonable age verification methods to verify the age of an individual attempting to access the material.

(2) A commercial entity or third party that performs the required age verification shall not retain any identifying information of the individual after access has been granted to the material.

(3) A commercial entity that is found to have violated this section shall be liable to an individual for damages resulting from a minor's accessing the material, including court costs and reasonable attorney fees as ordered by the court.

(4) A commercial entity that is found to have knowingly retained identifying information of the individual after access has been granted to the individual shall be liable to the individual for damages resulting from retaining the identifying information, including court costs and reasonable attorney fees as ordered by the court.

(5) This section shall not apply to any bona fide news or public interest broadcast, website video, report, or event and shall not be construed to affect the rights of a news-gathering organization.

(6) No Internet service provider, affiliate or subsidiary of an Internet service provider, search engine, or cloud service provider shall be held to have violated the provisions of this section solely for providing access or connection to or from a website or other information or content on the Internet, or a facility, system, or network not under that provider's control, including transmission, downloading, storing, or providing access, to the extent that such provider is not responsible for the creation of the content of the communication that constitutes material harmful to minors.

26. The Act became effective on May 3, 2023.

## III.    The Act's Impact

27. With the Act in effect, commercial websites providing content that they are concerned might

meet the vague statutory definition of "material harmful to minors" may respond in one of

three ways: by (1) diverting all web traffic from Utah IP addresses, thus precluding all online

visitors from this State; (2) developing (at great expense) their own age-verification

platforms to interact with mDL (again, at great expense) to age-verify visitors to their site (as

the mDL app does not, by itself, afford digital passage to any website); or (3) declining to

abide by the terms of the Act, thus risking lawsuits. It is a Hobson's Choice they should not

have to make.

### A.  The Ineffectiveness of the Act and the Effectiveness of Alternative Means

28. While placing overwhelming burdens on certain providers of content online, the Act will fail

to accomplish its goal of protecting Utah's minors. Because the Act requires age-verification

in order to access only those websites that offer "material harmful to minors" as a

"substantial portion" of their total content (defined as one-third or more), minors will face no

impediment to obtaining such material from websites watered down—either incidentally or

purposefully in order to avoid the consequences of the Act— with *other* content unoffensive

to the sensibilities of the Utah legislature. Whether "content" percentages are measured in

bytes of material, discrete web pages, seconds of video, words of a sexual nature, or some

other metric, and whether it includes linked material, is entirely unclear. What *is* clear is

that—given enough non-"harmful" material on a single site—even the providers of material

that *is* "harmful to minors" under any definition earn a pass under the Act.

29. Minors also have other routes to obtaining "material harmful to minors" over the internet,

including by: (1) pursuing such material published by persons and entities in other countries

beyond the jurisdiction of Utah's state or federal courts; (2) using a virtual private network

(VPN) to create an encrypted connection between the device and a remote server operated by

the VPN service in another state or country[8]; and (3) resorting to the dark web to obtain

material far more harmful than what is available from popular adult websites.

30. At the same time, there are alternative means available for Utah parents to address the stated

goal of the Act. The two major personal computer operating systems, Microsoft and Apple,

include parental control features straight out of the box. Almost all browsers, including

Google Chrome, Mozilla Firefox, Microsoft Edge, and Apple's Safari, also have parental

control options. If parents want to add additional parental control features, they may easily

purchase supplementary software like Bark or NetNanny or even download additional

software for free, including Questodio, Kaspersky Safe Kids, FamilyKeeper, and others.

These features enable parents to block access to sexually explicit materials on the Web,

prevent minors from giving personal information to strangers by e-mail or in chat rooms,

limit a child's screentime, and maintain a log of all online activity on a home computer.

Parents can also use screening software that blocks messages containing certain words, as

well as tracking and monitoring software. A parent also may restrict and observe a child's

use of the internet merely by placing a computer in a public space within the home. All of

these methods constitute "less restrictive means" for accomplishing the same ends.

31. Over twenty years ago, the United States Supreme Court recognized that even the parental

filtering programs available at the time were less restrictive and certainly more effective than

government-imposed age-verification methods. *See Ashcroft v. ACLU*, 542 U.S. 656, 666

(2002). In that case, although a credit card was required for age-verification, the Court noted

that it was *still* a less effective option due to the high rate of false certification.

---

[8] *See* https://www.pcmag.com/how-to/what-is-a-vpn-and-why-you-need-one.

**B.  The Impact on Older Minors**

32. The impact of the Act and its constitutionality depends, to a significant extent, on the meaning of "material harmful to minors" under Utah law. In *Ginsberg v. New York*, 390 U.S. 629 (1968), the United States Supreme Court established an obscenity test for minors, variable as to each of its three components—whether the material appeals to the prurient, shameful, or morbid interest of minors in sex; whether the material is offensive to the average adult applying contemporary community standards with respect to what is suitable for minors; and whether material taken as a whole lacks serious literary, artistic, political, or scientific value for minors.

33. With respect to at least the second and third components of this test—what is suitable for minors under contemporary community standards, and whether the material has serious value for minors—the variability relates to the age and maturity of the minor. There is a broad range of material that has serious literary, artistic, political, or scientific value for at least some 16- and 17-year-olds which might legitimately be considered "harmful" to a 10-year-old. For example, materials about sexual relations, the risk of sexually-transmitted diseases, sexual health, and the enjoyment of sex certainly have serious value to many 16- and 17-year-olds in Utah (where 16-year-old minors may marry with parental consent).

34. Because the Act apparently includes material appropriate for older minors within the scope of "material harmful to minors" that requires age verification, it is unconstitutional for the reasons set forth throughout this Complaint. Whether material is designed to appeal to the prurient interest is determined by an average person applying contemporary community standards *with respect to minors*. Whether material is presented in a "patently offensive"

manner is, again, considered *with respect to minors*. And whether the material lacks serious literary, artistic, political, or scientific value is, again, considered *with respect to minors*.

35. The Act fails to explicitly exclude material appropriate for older minors from the "material harmful to minors" for which access is conditioned upon proof of majority. Requiring persons who publish such material on the internet to place it behind an age-verification wall violates the First and Fourteenth Amendments by infringing the constitutional rights of both older minors (who are denied access to constitutionally-protected material), and the commercial entities that publish or distribute such material.

**C.   The Impact on All Minors**

36. Requiring age verification to access a website whose content offerings include a "substantial portion" of "material harmful to minors" means denying those minors access to websites whose content offerings are overwhelmingly *not* classified as "material harmful to minors." *See* Section 78B-3-1001(10) (defining "substantial portion" to mean "more than 33-1/3% of total material on a website"). The Act aims to preclude <u>all</u> minors from accessing even those websites offering content, two-thirds of which is plainly *not* violative of the already vague and overbroad standard defining "material harmful to minors." Conceivably, websites like Twitter could soon find themselves falling with the Act's ambit.[9]

**D.   The Impact on Adults**

37. The Act demands that, as a condition of access to constitutionally protected content, an adult must provide a digital proof of identity to adult content websites that are doubtlessly capable

---

[9] *See* https://www.reuters.com/technology/exclusive-where-did-tweeters-go-twitter-is-losing-its-most-active-users-internal-2022-10-25/ (noting the growth of adult content on Twitter).

of tracking specific searches and views of some of the most sensitive, personal, and private contents a human being might search for. Although the Act provides a cause of action to any website visitor whose identifying information is retained by the website, such provision offers cold comfort to adults who value the privacy of their search history for non-obscene pornographic material more than a speculative damages award in an era of rampant data leaks—including from websites purporting to place a premium on privacy and discretion.[10] The inevitable result is that at least some portion of Utah adults will feel the chill of the Act and forego accessing this constitutionally-protected material.

### E.  The Impact on Non-Pornographic Websites

38. Because of the Act's vagueness, cautious operators of even *non*-pornographic websites must place an age-verification content wall over their entire websites if they wish to continue communicating with Utah audiences without risking ruinous tort liability. Doing so labels them an "adult business"—resulting not only in declining internet traffic, but social stigma, lost ad revenue, and exclusion from public or private programs or curricula. If they are a website that processes payments, they may lose the ability to accept VISA, Mastercard, Amex, and other major credit cards and be forced to use third-party billing companies that charge fees up to 15% of the purchase price, rather than the 3-5% typically charged by credit card companies. They also may face difficulty purchasing business liability insurance and hiring employees. Some of the Supreme Court's leading First Amendment precedents have established the principle that the government may not compel persons to speak a particular

---

[10] *See, e.g.,* https://www.wired.com/2015/08/happened-hackers-posted-stolen-ashley-madison-data/ (discussing Ashley Madison data breach).

message. *See Wooley* v. *Maynard,* 430 U.S. 705 (1977) (requiring motorists to display state's "live free or die" motto on license plate found to violate First Amendment); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc*., 515 U.S. 557 (1995) (finding First Amendment violation where parade organizers were forced to accept groups espousing contrary messages). That principle is simply incompatible with the requirement of commercial entities that find themselves on the margins of the Act's reach.

**F.  Vagueness and Overbreadth**

39. Because many of the terms in the Act are vague and overbroad, the Act further chills the speech of providers of content online and restricts the availability of certain material to those entitled and wishing to receive it. The Act is riddled with vague words, phrases, and requirements, including the following.

40. The phrase "taken as a whole" in the definition of "material harmful to minors" is vague because what constitutes the "whole" is unclear in the context of the internet generally, or a particular website more specifically. Should one consider only a specific article, certain text, or an individual image on a website? Or should one consider the web page on which that text or image appears? Or the entire website? And should one include linked material?

41. The phrase "substantial portion," defined as "more than 33-1/3% of total material on a website," is vague insofar as it fails to explain how "total material" is calculated. Is it by the volume of data? The number of posts? What is the proper metric to measure? Gigabytes? Character count? Number of images? Video runtime? And what about linked material? May a website avoid the problem altogether by providing a link to all the anodyne content in the local public library?

42. The term "minor," defined as "any person under 18 years old," is vague insofar as it fails to designate the whole from which a content provider must ascertain the average. Pursuant to the Act, whether material is designed to appeal to the prurient interest, is presented in a "patently offensive manner," or lacks serious literary, artistic, political, or scientific value is determined with respect to minors. Does this "minor" refer to an average 17-year-old days from an 18th birthday? Or some hypothetical pre-teen reflecting the median sensibility across *all* minors, from infants to high school seniors? Or some other person or position?

43. The statutory catch-all permitting "any commercially reasonable method that relies on public or private transactional data" as a means of verifying a user's age provides no guideposts whatsoever, as "commercially reasonable" is a vague term not defined by the Act.

44. Reference to "contemporary community standards" is vague and overbroad, due to the borderless nature of the internet. Utah is a diverse state, and the "contemporary community standards" vary widely from Park City to Provo. But when a content provider publishes material on a website, the same material is made available in *every* Utah county. To avoid running afoul of the Act, websites must abide by a "most prudish county" standard—restricting (in the case of minors) or chilling (in the case of adults) substantial quantities of constitutionally protected content.

45. It is unclear what, exactly, a commercial entity must "know" or "intend" to be liable under the Act. Must the entity merely intend to publish or distribute material that, incidentally, happens to fit the statutory definition of "material harmful to minors?" Must the entity *know* that the published material meets that definition? Must it know that the publishing website's offerings, as a whole, contain at least one-third such material? The question is of particular

salience to commercial entities that publish or distribute materials on websites owned and operated by *other* commercial entities—potentially tasking the former with a duty to inventory the full array of materials offered by the latter.

### G. The Prior Restraint

46. The Act effectively requires that, before a covered commercial website may disseminate any constitutionally protected expression to a consenting adult requesting it, the website must affirmatively employ a "reasonable age verification method" on pain of express statutory liability. The requirement thus imposes a classic prior restraint on speech.

47. Prior restraints are not unconstitutional per se, but they come to the courts bearing "a heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). Prior restraints arising from a government pre-approval requirement are presumptively unconstitutional because they pose the danger that any discretion exercised in connection with the approval process may become an instrument of content-based censorship that will impose a serious chill upon the willingness of affected speakers to speak. Government may not require this sort of pre-approval process unless the discretion involved in administering it—both substantive and procedural—is tightly constrained to avoid the inherent censorship dangers.

48. With respect to those procedural safeguards, the pre-approval process must be administered so that the presumption favors allowing the expression in question; the burden must always fall on the side of disallowing the expression. Secondly, the pre-approval process must operate rapidly and without unnecessary delay. Finally, the costs of the pre-approval process,

if assessed to the putative speaker at all, must also be tightly and objectively constrained so as to avoid unnecessarily burdening the expression in question.

49. At two points in its operation, the Act imposes unconstitutional prior restraints on the communication between covered websites and adults seeking to access them. First, covered websites must employ "reasonable age verification methods" when individuals attempt to access their expression. But even assuming that these statutory specifications suffice, nothing requires that any such methods be made available to all website operators, operate reliably with common computer software, or even exist in the first place. The State of Utah may not statutorily impose a prior restraint only to leave its operation entirely to others who may or may not take up the mantle—*particularly* when leaving key terms like "commercially reasonable" undefined. Moreover, nothing constrains how quickly such systems must operate or what fees they may charge for their services.

50. The same unconstrained discretion applies to the digitized identification card age verification option. Although one such card presently exists for a limited number of operating systems, the State of Utah does not provide it directly but only through a commercial entity that may or may not continue to exist, may or may not choose to do business with covered websites, and may or may charge constitutionally permissible fees for use of its product. And critically, the digitized card does not yet provide for the *online* verification necessary for it to be of any use to putative providers and viewers of "material harmful to minors" online.

51. Thus, nothing in the Act requires the State or its contractors to operate a properly constrained prior restraint on speech, and nothing prevents content-based discrimination that would leave covered websites without any "reasonable age verification methods" at all.

### H.  The Exception for "News-Gathering" Organizations

52. The Act purports to exempt any "bona fide news or public interest broadcast, website video, report, or event and shall not be construed to affect the rights of a news-gathering organization." Section 78B-3-1002(5). "News-gathering organization" is defined to include "(a) an employee of a newspaper, news publication, or news source, printed or on an online or mobile platform, of current news and public interest, while operating as an employee as provided in this subsection, who can provide documentation of such employment with the newspaper, news publication, or news source; or (b) an employee of a radio broadcast station, television broadcast station, cable television operator, or wire service while operating as an employee as provided in this subsection, who can provide documentation of such employment." Section 78B-3-1001(7). Through this definition, the Act makes impermissible distinctions among media providers—exempting any employee of chosen media while offering no such protection to independent (non-employee) "news gatherers," or to bloggers, vloggers (video bloggers), or podcasters whose platforms do not fit within the definition of "news-gathering organization."

53. This vague exemption seeks to preserve the free speech rights of some while trampling on the free speech rights of others who publish the same content. While independent news gatherers receive no exemption, news websites like Str8upgayporn.com, xbiz.com, and avn.com—which focus on the adult entertainment industry and contain a significant amount of material otherwise regulated by the Act—likely are not subject to the age-verification procedures. By making this distinction among media, the Act violates the free speech and

freedom of the press provisions of the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment.

## I.   The Invasion of Privacy Interests

54. The Act violates the right to substantive due process as guaranteed by the Fourteenth Amendment to the United States Constitution, as it impinges upon liberty and privacy interest in one's own private sexual conduct. *See Lawrence v. Texas*, 539 U.S. 558 (2003).

55. Offline age-verification does not produce a ledger of age-verified adults; one may enter an adult bookstore or sex shop merely by presenting a license proving his or her age of majority, and the clerk need not do anything beyond checking the date of birth and returning the ID. But age-verification over the internet, in the manner contemplated by the Act, invites the risk, real or perceived, that the viewer's digital "fingerprint" will be left on the site—and not just on the website's "front door," but on every bit of digital content examined. It's a striking invasion of privacy at a time and place when a person legitimately expects it most. No governmental interest exists sufficient to justify this intrusion.

## J.   The Burden on Interstate and Foreign Commerce

56. The Act burdens interstate commerce by impinging on communication, protected by the First Amendment, between out-of-state content-providers and Utahns in several ways.

57. The Act effectively requires a website operator to choose between (on one hand) diverting web traffic from Utah or (on the other) making the laborious determination of whether more than one-third of its content fits the vague and overbroad definition of "material harmful to minors" and then instituting the State's required age-verification protocols. And because satellites and cellular towers do not appreciate state boundaries, residents of border towns in

the neighboring states of Idaho, Colorado, New Mexico, Arizona, and Nevada might find

their devices restricted from accessing certain websites, too.

58. Moreover, Utah might be among the first to market with these age-verification requirements,

but it surely won't be the last, as Louisiana, Virginia, West Virginia, Mississippi, Arkansas,

Florida, and others have passed or are considering similar legislation. In Washington, D.C.,

Utah's own Sen. Mike Lee has introduced a bill that would similarly require age verification,

but on a national level.[11] With each state or locality defining "material harmful to minors"

differently, requiring consideration of different community standards, and demanding

different age-verification technologies and protocols, website operator compliance becomes

exorbitantly laborious, confusing, and expensive. The result might be a total shutdown of

adult websites or stringent, across-the-board age-verification protocols affecting users from

states that have *not* imposed similar restrictions on web content. The interstate exchange of

constitutionally-protected material clearly outweighs any one state's—including Utah's—

legitimate interests in requiring age verification to protect minors from certain adult content

online.

### K.  The Express Conflict with Federal Statutory Law

59. Under Section 230, "[n]o provider or user of an interactive computer service shall be treated

as the publisher or speaker of any information provided by another information content

provider." 47 U.S.C § 230(c)(1).

60. Plaintiff JFF is a "provider or user of an interactive computer service" within the intendment

of the statute. *See* 47 U.S.C § 230(f)(2) (defining "interactive computer service" to mean

---

[11] *See* https://www.lee.senate.gov/2022/12/sen-lee-introduces-bill-to-protect-children-online.

"any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions."). Plaintiff does not produce content that could plausibly be deemed "material harmful to minors." Rather, it merely provides the platform for other "information content providers." *See* 47 U.S.C § 230(f)(3) (defining term to mean "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service").

61. In seeking to render JFF and other providers and users of "interactive computer services" liable on account of the actions of "content providers," the Act stands in direct conflict with Section 230, which expressly preempts inconsistent state laws. *See* 47 U.S.C § 230(e)(3). Article VI, Paragraph 2 of the U.S. Constitution requires that federal law take precedence in such case.

**L. The Need for Injunctive Relief**

62. The passage of the Act has placed Plaintiffs in reasonable fear that, if they continue to exercise their constitutional rights, they will be sued under the Act by any host of individuals alleging harm. Plaintiffs have no adequate remedy at law.

63. Moreover, because the Act creates a *private* right of action by which Utah residents—and not state actors—are empowered to do the State's bidding, protecting the constitutional rights at issue requires enjoining the Commissioner of Utah's Department of Public Safety from permitting its data files to be downloaded for use by the mDL Program, and the Attorney General from otherwise intervening to enforce the Act.

## CAUSES OF ACTION

### COUNT I (All Plaintiffs)

### Violation of Free Speech Rights Under the First and Fourteenth
### Amendments of the United States Constitution

64. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

65. The Act violates the First Amendment (made applicable to the states through the Fourteenth Amendment) both on its face and as applied to Plaintiffs because it unconstitutionally interferes with their ability to communicate constitutionally protected speech, compels speech to the detriment of Plaintiff businesses, and imposes an unconstrained prior restraint on speech.

66. The Act violates the rights of Plaintiffs under the First and Fourteenth Amendments to the United States Constitution because it is not the least restrictive means of accomplishing any compelling governmental purpose.

67. The Act violates the rights of Plaintiffs under the First and Fourteenth Amendments to the United States Constitution because it is substantially overbroad.

### COUNT II (All Plaintiffs)

### Violation of the Fourteenth Amendment of the United States Constitution

68. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

69. The Act violates the rights of Plaintiffs under the Due Process Clause of the Fourteenth Amendment (procedural component) because it is impermissibly vague and fails to provide a person of ordinary intelligence fair notice of what is prohibited.

70. The Act violates the rights of Plaintiffs under the Due Process Clause of the Fourteenth Amendment (substantive component) because it intrudes into the private sexual conduct and

proclivities of adults, thus impairing a fundamental right in a manner that is not the least

restrictive means of accomplishing any compelling governmental purpose.

71. The Act violates the equal protection provisions of the Fourteenth Amendment because, with

no rational basis for doing so, it exempts certain news-gathering organizations while

subjecting others its every restriction.

## COUNT III (All Plaintiffs)

### Violation of the Commerce Clause of the United States Constitution

72. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

73. The Act violates the rights of Plaintiffs under the Commerce Clause because it constitutes an

unreasonable and undue burden on interstate and foreign commerce.

## COUNT IV (Plaintiff JFF only)

### Violation of the Supremacy Clause and Section 230

74. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

75. The Act violates the rights of Plaintiff JFF, a provider and user of an "interactive computer

service" within the meaning of 47 U.S.C. § 230, because it effectively treats Plaintiff as the

publisher or speaker of material provided by other information content providers. As

47 U.S.C. § 230(e)(3) states that "[n]o cause of action may be brought and no liability may

be imposed under any State or local law that is inconsistent" with Section 230, the Act

violates Section 230.

76. Article VI, Paragraph 2 of the United States Constitution (Supremacy Clause) exalts the laws

of the United States as "the supreme law of the land" notwithstanding "anything in the

constitution or laws of any State to the contrary." Given the direct conflict between the

(Utah) Act and the (federal) Section 230, the federal law must preempt the State's.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A.  Declare that UTAH CODE ANN. §§ 78B-3-1001 and 1002 violate the First and Fourteenth Amendments to, and the Commerce and Supremacy Clauses of, the United States Constitution;

B.  Preliminarily and permanently enjoin Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the Act;

C.  Award Plaintiffs their reasonable costs and fees pursuant to 42 U.S.C. § 1988; and

D.  Grant Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully Submitted,

Dated: *May 03, 2023*

*/s/ Jerome Mooney*
_____
Jerome Mooney
Weston, Garrou & Mooney

D. Gill Sperlein
The Law Office of D. Gill Sperlein

Jeffrey Keith Sandman
Webb Daniel Friedlander LLP

Attorneys for Plaintiffs