Jeffrey Keith Sandman
LA Bar No. 39073, admitted pro hac vice
Webb Daniel Friedlander LLP
5208 Magazine St Ste 364
New Orleans, LA  70115
Phone: (978) 886-0639
e-mail: jeff.sandman@webbdaniel.law

D. Gill Sperlein
CA Bar No. 172887, admitted pro hac vice
The Law Office of D. Gill Sperlein
345 Grove Street
San Francisco, CA  94102
Phone: 415-404-6615
e-mail: gill@sperleinlaw.com

Jerome Mooney
SBN 2303
Weston, Garrou & Mooney
50 West Broadway, #300
Salt Lake City, Utah  84101
Phone: 801-364-5635
e-mail: jerrym@mooneylaw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

|  |  |
|---|---|
| FREE SPEECH COALITION, INC.; D.S. DAWSON; JOHN DOE; DEEP CONNECTION TECHNOLOGIES, INC.; CHARYN PFEUFFER; and JFF PUBLICATIONS, LLC,<br><br>               Plaintiffs,<br><br>v.<br><br>JESS L. ANDERSON, in his official capacity as THE COMMISSIONER OF THE UTAH DEPARTMENT OF PUBLIC SAFETY; and SEAN D. REYES, in his official capacity as THE ATTORNEY GENERAL OF THE STATE OF UTAH,<br><br>               Defendants. | PLAINTIFFS' MOTION AND SUPPORTING MEMORANDUM FOR PRELIMINARY INJUNCTION<br><br>CASE NO.: 23-cv-287<br><br>JUDGE STEWART<br>MAG. JUDGE OBERG |

TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................................ 1

II.   FACTUAL BACKGROUND ......................................................................................... 3

  1.   THE ACT ................................................................................................................... 3

  2.   THE PLAINTIFFS ...................................................................................................... 5

III.  LEGAL BACKGROUND AND HISTORY .................................................................. 6

IV.   ARGUMENT ................................................................................................................ 12

  1.   LEGAL STANDARDS GOVERNING ISSUANCE OF A PRELIMINARY INJUNCTION. ..................... 12

  2.   PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THE MERITS .............................. 13

    A.   *The Act is a content-based regulation of speech that cannot survive strict scrutiny, as the First Amendment demands.* ........................................................................... 13

      i.    The Act is not narrowly tailored to serve Utah's interest ........................................ 14

        a.   "As a whole" ............................................................................................. 14

        b.   "Minor" ..................................................................................................... 16

        c.   "Substantial portion" ................................................................................ 17

        d.   "Commercial entity" and "website" .......................................................... 18

        e.   Chill on adult speech ................................................................................ 20

        f.   Compelled speech ..................................................................................... 21

      ii.   The Act is not the least restrictive means of serving Utah's interest ..................... 22

    B.   *The Act is both constitutionally overbroad and vague.* ................................................... 25

    C.   *The Act violates the Commerce Clause.* ........................................................................ 29

      i.    The Act impermissibly regulates the activities of out-of-state websites. ................. 29

      ii.   The Act's burdens on interstate commerce clearly outweigh any local benefits. ...... 29

      iii.  The Act creates inconsistent regulation of the internet. ........................................ 30

3.   PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE INJURY ABSENT IMPOSITION OF THE INJUNCTION. ........................................................................................................... 31

4.   THE BALANCE OF HARMS TILTS TOWARD PLAINTIFFS. ....................................................... 32

5.   AN INJUNCTION IS NOT ADVERSE TO THE PUBLIC INTEREST. ................................................. 32

V.   CONCLUSION ......................................................................................................... 33

## TABLE OF AUTHORITIES

### CASES

*303 Creative LLC v. Elenis*, 6 F.4th 1160 (10th Cir. 2021) ........................................................ 21

*ACLU v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003) ................................................................... passim

*ACLU v. Goddard*, Civ. 00- 0505 (D. Ariz. Aug. 11, 2004) ...................................................... 12

*ACLU v. Gonzales*, 478 F. Supp. 2d 775 (E.D. Pa. 2007) ................................................... 10, 19

*ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) ........................................................ 11, 29, 30

*ACLU v. Mukasey*, 534 F.3d 181 (3rd Cir. 2008) ................................................................. passim

*ACLU v. Reno*, 217 F.3d 162 (3d Cir. 2000) ............................................................................... 8

*ACLU v. Reno*, 31 F. Supp. 2d 473 (E.D. Pa. 1999) ............................................................ 1, 7, 8

*American Booksellers Foundation v. Coakley*, 2010 WL 4273802 (D. Mass. 2010) ................. 11

*American Booksellers Foundation v. Dean*, 342 F.3d 96 (2d Cir. 2003) ................................... 11

*American Booksellers Foundation v. Sullivan*, 799 F. Supp. 2d 1078 (D. Alaska 2011) ............ 11

*American Booksellers Foundation v. Webb*, 919 F.2d 1493 (11th Cir. 1990) ............................ 16

*American Libraries Ass'n v. Pataki*, 969 F. Supp. 160 (S.D.N.Y.1997) ............................... 12, 30

*Ashcroft v. ACLU*, 535 U.S. 564 (2002) ................................................................................... 15

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ................................................................................. 9, 24

*Ashcroft v. Free Speech Coalition,* 535 U.S. 234 (2002) ...................................................... 15, 25

*Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012) .................................................................. 31, 32

*Bibb* v. *Navajo Freight Lines, Inc.*, 359 U. S. 520 (1959) ............................................................ 30

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ........................................................................... 25

*Cate v. Oldham*, 707 F.2d 1176 (10th Cir. 1983) ...................................................................... 32

*Connally v. General Constr. Co.*, 269 U.S. 385 (1926) .......................................................... 26, 28

*Cyberspace Communications, Inc. v. Engler*, 238 F.3d 420 (6th Cir. 2000) .............................. 11

*Denver Area Educ. Telecomms. Consortium v. FCC*, 518 U.S. 727 (1996) ................................. 20

*Elrod v. Burns*, 427 U.S. 347 (1976) ............................................................... 25, 31

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) ............................................ 28

*Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117 (1978) ...................................... 30

*Free the Nipple-Fort Collins v. City of Fort Collins, Colorado,* 916 F.3d 792 (10th Cir. 2019) 12, 31, 32

*Garden Dist. Book Shop, Inc. v. Stewart*, 184 F. Supp. 3d 331 (M.D. La. 2016) ........................ 11

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ................................................. 26

*Healy v. Beer Inst.*, 491 U.S. 324 (1989). ........................................................ 29

*Heideman v. South Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003) .................................. 31

*Kolender v. Lawson*, 461 U.S. 352 (1983) .......................................................... 25

*Lamont v. Postmaster General*, 381 U.S. 301 (1965) ................................................ 20

*NAACP v. Button*, 371 U.S. 415 (1963) ............................................................. 26

*Nat'l Pork Prods. Council v. Ross,* 598 U. S. ____ (2023) ......................................... 29, 30

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) .................................................. 29, 30

*Pope v. Illinois*, 481 U.S. 497 (1987) ............................................................ 16

*PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) ............................................ 11

*Reno v. ACLU*, 521 U.S. 844 (1997) ............................................................ passim

*Sable Commc'ns of Cal., Inc. v. Fed. Commc'ns Comm'n*, 492 U.S. 115 (1989) ........... 14, 22, 28

*Southeast Booksellers v. Ass'n v. McMaster*, 282 F. Supp. 2d 389 (D.S.C. 2003) ..................... 12

*Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761 (1945) .......................... 30

*United States v. Playboy Entm't Grp., Inc.,* 529 U.S. 803 (2000). ................................. 12

*United States v. Stevens*, 559 U.S. 460 (2010) ................................................. 13, 31

## Statutes

18 U.S.C. § 1988 ..................................................................................................... 2

18 U.S.C. § 2201 ..................................................................................................... 2

18 U.S.C. § 2202 ..................................................................................................... 2

42 U.S.C. § 1983 ..................................................................................................... 2

47 U.S.C. § 223 ...................................................................................................... 7

47 U.S.C. § 231 ............................................................................................. 7, 8, 15

Utah Code Ann. § 78B-3-1001, 1002 ................................................................. passim

## Treatises

Wright & Miller, Fed Prac. & Proc. § 2948.2 ......................................................... 32

*"Indeed, perhaps we do the minors of this country harm if First Amendment protections, which they will with age inherit fully, are chipped away in the name of their protection."*

- Judge Lowell A. Reed, Jr.

*ACLU v. Reno*, 31 F. Supp. 2d 473, 498 (E.D. Pa. 1999)

\* \* \*

Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 7-1, Plaintiffs, through undersigned counsel, respectfully move this Honorable Court for preliminary injunctive relief pending resolution of the case on the merits. Because of the stakes and complexity of the issues herein, Plaintiffs respectfully request oral argument on this motion.

## I.      INTRODUCTION

After numerous federal court decisions invalidating as unconstitutional state and federal laws seeking to regulate or ban the publication of material harmful to minors on the internet, the Utah legislature has tried once more. S.B. 287 ("Act" or "Utah Act") place substantial burdens on Plaintiff website operators, content creators, and countless others who use the internet by requiring websites to age-verify every internet user before providing access to non-obscene material that meets the State's murky definition of "material harmful to minors."

This attempt to restrict access to online content is not novel. The United States Supreme Court invalidated a federal law restricting internet communications deemed harmful to minors on First Amendment grounds in *Reno v. ACLU*, 521 U.S. 844 (1997). The Third Circuit invalidated a second such law on First Amendment grounds in *ACLU v. Mukasey*, 534 F.3d 181 (3rd Cir. 2008), *cert. denied*, 555 U.S. 1137 (2009). And in state after state, laws containing content-based restrictions on internet communications deemed harmful to minors have been held unconstitutional. Yet despite this long legacy of constitutional invalidity, the Utah Legislature has used not just the same tired justifications, but even the same statutory terms and definitions

that led to invalidation of those past efforts. In doing so, it has placed Plaintiffs in the untenable position of abiding by the Act's terms and enduring the constitutional infringement, or violating the Act and risking lawsuits.

The Act violates the First Amendment in several respects. First, it imposes a content-based restriction on protected speech that requires narrow tailoring and use of the least restrictive means to serve a compelling state interest, yet it captures a substantial quantity of protected speech without accomplishing its stated purpose of protecting minors from materials they may easily obtain from other sources and via other means. Because the Act is substantially overbroad and vague, it poses additional concerns under the First and Fourteenth Amendments. The Act also significantly burdens interstate commerce by regulating out-of-state conduct and contributing to a growing patchwork of state laws legislating the 21st Century's most crucial instrumentality of commerce—the internet.

Plaintiffs are a diverse mix of individuals and entities who, pursuant to 18 U.S.C. § 2201 and 2202, and 42 U.S.C. § 1983 and 1988, are seeking declaratory and injunctive relief to vindicate rights secured by the Constitution. To stave off irreparable injury from the (present and continuing) deprivation of these rights, they move herein for a preliminary injunction pending the final determination of their claims. [1]

---

[1] At this time, Plaintiffs do not move for a preliminary injunction as to claims that the Act (a) works as a presumptively unconstitutional "prior restraint" on speech; (b) violates the Equal Protection Clause by excepting certain "news-gathering organizations" from its ambit; (c) violates "fundamental rights" secured by the Due Process Clause; or (d) is preempted by 47 U.S.C. § 230 ("Section 230"). Plaintiffs reserve all rights to assert these claims at a later date.

## II.      FACTUAL BACKGROUND

### 1.  The Act

Utah's S.B. 287, codified at Sections 78B-3-1001 and 1002 of the Utah Code, imposes liability upon a "commercial entity that knowingly and intentionally publishes or distributes material harmful to minors on the Internet from a website that contains a substantial portion of such material . . . [where] the entity fails to perform reasonable age verification methods to verify the age of an individual attempting to access the material." Such liability includes "damages resulting from a minor's accessing them material, including court costs and reasonable attorney fees[.]"

A "commercial entity" includes every "legally recognized entit[y]" from the largest corporation down to the smallest "sole proprietorship." "Substantial portion" means "more than 33-1/3% of total material on a website, which meets the definition of 'material harmful to minors' as defined[.]" "Reasonable age verification methods" are limited to (a) "use of a digitized identification card" through "a state-approved application" that downloads a "data file from a state agency or an authorized agent of a state agency" which contains "all of the data elements visible on the face and back of a license or identification card and displays the current status of the license or identification card"; (b) "an independent, third-party age verification service that compares the personal information entered" by the user against a "commercially available database, or aggregate of databases, that is regularly used by government agencies and businesses for the purpose of age and identity verification"; or (c) "any commercially reasonable method that relies on public or private transactional data" to verify the user's age.

The Act's definition of "material harmful to minors" attempts to track the Supreme Court's modified-for-minors *Miller* Test[2] and includes "(a) any material that the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest; (b) material that exploits, is devoted to, or principally consists of descriptions of actual, simulated, or animated display or depiction of [certain body parts (including "the nipple of the female breast") or sexual acts (including "touching . . . of "nipples, breasts, [or] buttocks")] in a manner patently offensive with respect to minors; <u>and</u> (c) the material taken as a whole lacks serious literary, artistic, political, or scientific value for minors" (emphasis added). "Minor" is defined as "any person under 18 years old."

In the few brief minutes that the Bill was debated on the floor of the Senate, its sponsor, Senator Todd Weiler, acknowledged the constitutional concerns presented:

> I wanted to run a bill like this a few years ago. I didn't know if it would pass constitutional muster so I gained a lot of confidence when I saw that Louisiana had done it, and I had people contacting me, some of whom are in the audience today, saying "hey, Louisiana did this so why doesn't Utah do it?"

*See* Senate Floor Debate, Day 42 (2/28/2023).[3] Rather than consult with attorneys or perform an independent dive into the constitutional merits, the Senator ostensibly took Louisiana's passage as a green light for Utah to follow suit. Senator Michael McKell, speaking in support of the Bill, explained on the floor of the Senate that traffic to adult websites in Louisiana had dropped significantly since its enactment of a nearly identical bill, which he characterized as "a positive

---

[2] *See Ginsberg v. United States*, 390 U.S. 629, 639 (1968) (adapting general test of obscenity under the First Amendment to reflect "prevailing standards in the adult community as a whole with respect to what is suitable material for minors").

[3] *Available at* https://le.utah.gov/av/floorArchive.jsp?markerID=122958.

impact right out of the gate." *Id.* Stifling adult speech is very much a *feature* of this legislation, not a bug.

### 2.  The Plaintiffs

Plaintiffs are a collection of non-profits, for-profits, and individuals who rely on the internet for communication, both as providers and recipients of First Amendment-protected materials.

**Free Speech Coalition, Inc. (FSC)** is a not-for-profit trade association representing hundreds of businesses and individuals involved in the production, distribution, sale, and presentation of constitutionally-protected and non-obscene materials that are disseminated to consenting adults via the internet. Most of that material would fit within Utah's statutory definition of "material harmful to minors." *See* Declaration of Alison Boden (hereinafter, "Boden Decl.").

**D.S. Dawson** is a 30-year-old man Utahn man who writes gay erotica under several different pennames. His stories are sold as e-books and paperbacks on Amazon and audiobooks on e-commerce platform Gumroad. Dawson drives traffic to Gumroad by posting audio previews on adult sites PornHub and xHamster (promotion that he credits with nearly all of his audiobook sales to date). *See* Declaration of D.S. Dawson (hereinafter, "Dawson Decl.").

**John Doe** is a 74-year-old Utah attorney who, as part of his legal practice, represents various adult bookstores and sexual device manufacturers, which requires that he visit websites that contain a substantial portion of material that may be deemed "harmful to minors" under the Act. Doe is concerned about providing any personal identifying information to gain entry to such websites as part of his work. *See* Declaration of John Doe (hereinafter, "Doe Decl.").

**Deep Connection Technologies Inc. (DCT)** is the company that operates O.school, an online educational platform focused on sexual wellness. Because of the breadth and vagueness of

the "material harmful to minors" definition, DCT is concerned that one-third or more of O.school content meets the statutory definition. As a provider of critical sex education appropriate (and necessary) for older minors, DCT opposes any age-verification measure that would preclude those teens from accessing O.school's content. *See* Declaration of Andrea Barrica (hereinafter, "Barrica Decl.").

**Charyn Pfeuffer (Pfeuffer)** is a 50-year-old woman living in Seattle, WA who has written professionally about sex and relationships for 25 years and created online sexual content for three. She is concerned that one-third of the online archive of her writings might contain what qualifies as "material harmful to minors," as well as much of her video content on webcam sites OnlyFans and SextPanther. She worries that she will be unable to perform qualifying "reasonable age verification methods," particularly as to content hosted on platforms operated by other commercial entities. *See* Declaration of Charlyn Pfeuffer (hereinafter, "Pfeuffer Decl.").

**JFF Publications, LLC (JFF)** is the limited liability company that operates an internet-based platform at the domain <JustFor.Fans> that allows independent performers of erotic audiovisual works to publish their content and provide access to fans on a subscription basis. JFF is confused about what the Act covers and demands, and concerned about the costs of compliance. *See* Declaration of Dominic Ford (hereinafter, "Ford Decl.").

### III.    LEGAL BACKGROUND AND HISTORY

For almost as long as the internet has been in American households, legislators at the state and federal levels have tried their hands at legislating disfavored content in a manner that would pass constitutional muster. They have roundly failed.

The first such attempt came via the federal Communications Decency Act (CDA) that criminalized, *inter alia,* the knowing dissemination of "obscene or indecent messages" to a

recipient under 18 years of age and any message that "in context, depicts or describes, in terms measured by contemporary community standards, sexual or excretory activities or organs." *See* 47 U.S.C. § 223(a), (d). Shortly after the CDA took effect, groups of businesses, libraries, not-for-profit organizations, and educational societies brought a First Amendment challenge, which a three-judge panel in the Eastern District of Pennsylvania granted, enjoining the enforcement of the Act. *See ACLU v. Reno*, 929 F. Supp. 824 (E.D. Pa. 1996).

The government appealed directly to the Supreme Court, which invalidated the challenged provisions and affirmed the lower court's injunction. *See Reno v. ACLU*, 521 U.S. 844 (1997). The Court first held that the provisions prohibiting transmission of "indecent" or "patently offensive" materials were blanket content-based restrictions on speech and not mere time, place, and manner regulations. As such, they would be strictly scrutinized. *See id.* So, too, were they facially overbroad—capturing much constitutionally protected material. *See id.* In reaching its decision, the Court did not apply the standards applicable to traditional broadcasting, which—*unlike* the internet—is a scarce and highly regulated resource. *See id.* at 870 ("Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soap box. Through the use of web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer. As the District Court found, 'the content on the Internet is as diverse as human thought.'").

After that invalidation, Congress returned to the drawing board to pass the Child Online Protection Act (COPA), which prohibited any person from knowingly "making any communication [over the internet] for commercial purposes available to any minor and that includes any material that is harmful to minors." 47 U.S.C. § 231. Publishers could assert an affirmative defense to prosecution if they restricted minors' access in one of several ways: "(A) by requiring use of a credit card, debit account, adult access code, or adult personal identification

number; (B) by accepting a digital certificate that verifies age; or (C) by any other reasonable measures that are feasible under available technology." *Id.* at § 231(c)(1). More limited than "indecent" or "patently offensive" messages, material "harmful to minors" was restricted to any communication, picture, image, graphic image file, article, recording, writing, or other matter of any kind that is obscene or that:

> (A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;
>
> (B) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and
>
> (C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

47 U.S.C. § 231(e)(6).

Again, the statute was challenged by a diverse array of website operators offering everything from "resources on obstetrics, gynecology, and sexual health" to "books and images for sale." The district court for the Eastern District of Pennsylvania granted a preliminary injunction, holding that the legislation, like that before it, was "content-based," presumptively invalid, and subject to strict scrutiny that it could not endure. *See ACLU v. Reno*, 31 F. Supp. 2d 473 (E.D. Pa. 1999) (holding that the prohibitions were not the "least restrictive means" of protecting children from the perceived harm). The Court of Appeals affirmed the injunction, albeit on different grounds—concluding that COPA's use of "contemporary community standards" to identify material that is "harmful to minors" by itself rendered the statute substantially overbroad, as the borderless nature of the internet would require speakers to abide by standards set by "the most puritan of communities in any state." *See ACLU v. Reno*, 217 F.3d 162, 175 (3d Cir. 2000). Because of the attending chilling effect, the panel reasoned that

websites would "shield vast amounts of material" in order to avoid potential liability—"lead[ing] inexorably to [its] holding of a likelihood of unconstitutionality of the entire COPA statute." *Id.* at 174.

The Supreme Court vacated the holding that the uncertainly regarding the "community standard" in and of itself rendered COPA unconstitutional, remanding for a determination whether the statute was unconstitutionally overbroad or void for vagueness under a strict scrutiny analysis. On remand, the Court of Appeals affirmed the district court's holding that the statute was unconstitutional insofar as it "was not narrowly tailored to serve a compelling government interest, was overbroad, and was not the least restrictive means available for the Government to serve the interest of preventing minors from using the Internet to gain access to materials that are harmful to them." *See ACLU v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003). In so holding, the Third Circuit acknowledged that device-level filters and blocking software achieved the purpose of restricting access by minors without suppressing the speech of the person who posts content on the Web. *See id.* at 261-66.

Upon review a second time, the Supreme Court affirmed the grant of a preliminary injunction. *See Ashcroft v. ACLU*, 542 U.S. 656 (2004). Specifically, it agreed that the least intrusive means of preventing minors from accessing erotic materials was through device-level technology, not site-level restrictions on speech:

> Filters are less restrictive than COPA. They impose selective restrictions on speech at the receiving end, not universal restrictions at the source. Under a filtering regime, adults without children may gain access to speech that have a right to see without having to identify themselves or provide credit card information. Even adults with children may obtain access to the same speech on the same terms by turning off the filter on their home computers. Above all, promoting the use of filters does not condemn as criminal any category of speech, and so the potential chilling effect is eliminated, or at least much diminished. All of these things are true, regardless of how broadly or narrowly the definitions in COPA are construed.

*Id.* at 667. *See also id.* (noting that filtering software was more effective than COPA at keeping minors from harmful material online, per "findings of the Commission on Child Online Protection, a blue-ribbon Commission created by Congress in COPA itself").

The Court remanded the case "for a trial on the merits in order to, *inter alia*, update the factual record to reflect current technological developments, account for any changes in the legal landscape, and to determine whether Internet content filters are more effective than COPA or whether other possible alternatives are less restrictive and more effective than COPA." *See ACLU v. Gonzales*, 478 F. Supp. 2d 775, 779 (E.D. Pa. 2007). After a trial, the district court applied strict scrutiny and concluded that that the statute failed to use the least restrictive means of achieving the state's interest where content filtering software was both less restrictive and more effective. *Id.* at 810-16. The court also found the statute substantially vague and overbroad in multiple respects. *Id.* at 816-20. For example, the terms "communication for commercial purposes" and "engaged in business" could be construed to apply even to web-based publishers of free material who nevertheless receive revenue through advertising—which would chill a substantial amount of constitutionally protected speech. *Id.* And by defining a "minor" as "any person under 17 years of age," the statute would apply equally to "an infant, a five-year old, or a person just shy of age seventeen"—even though what is "patently offensive," of "prurient interest," and of "serious literary, artistic, political, or scientific value" varies greatly depending on a minor's age. *Id.*

The Third Circuit again affirmed. *See ACLU v. Mukasey*, 534 F.3d 181, 207 (3d Cir. 2008) ("COPA cannot withstand a strict scrutiny, vagueness, or overbreadth analysis and thus is unconstitutional."). Specifically, it found a lack of precision in Congress's tailoring the statute to its interest in protecting children. The terms and phrases "as a whole," "minor," and "commercial purposes" caused the statute to capture too much protected material, whereas the affirmative

-10-

defenses were not practicable because "many Web users are simply unwilling to provide identification information in order to gain access to content, especially where the information they wish to access is sensitive or controversial." *Id.* at 190-92. So, too, did COPA fail to employ the least restrictive means of effecting the government's interest, as the record below demonstrated that "filters and the Government's promotion of filters are more effective than COPA." *Id.* at 202. For many of the same reasons, COPA was vague and substantially overbroad, as well. *Id.* at 204-07.

With the Supreme Court's denial of certiorari, *see* 555 U.S. 1137 (2009), Congress ostensibly lost its will to tinker with the statute once more, and the Third Circuit's *Mukasey* decision remains the last authoritative word on a federal attempt to restrict "harmful to minors" content on the internet. But states have taken up that mantle—albeit with the same record of failure.[4] *See, e.g., Garden Dist. Book Shop, Inc. v. Stewart*, 184 F. Supp. 3d 331 (M.D. La. 2016) (Louisiana), *American Booksellers Foundation v. Sullivan*, 799 F. Supp. 2d 1078 (D. Alaska 2011) (Alaska), *American Booksellers Foundation v. Coakley*, 2010 WL 4273802 (D. Mass. 2010) (Mass.); *PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) (Virginia), *American Booksellers Foundation v. Dean*, 342 F.3d 96 (2d Cir. 2003) (Vermont), *Cyberspace Communications, Inc. v. Engler*, 238 F.3d 420 (6th Cir. 2000) (Michigan), *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) (New Mexico), *ACLU v. Goddard*, Civ. 00- 0505 (D. Ariz. Aug.

---

[4] In those cases, not only do the First Amendment implications remain the same, but new Commerce Clause concerns arise when state legislatures, rather than Congress, attempt to regulate so fundamental an instrumentality of commerce as the internet. *See, e.g., ACLU v. Johnson*, 194 F.3d 1149, 1161 (10th Cir. 1999) (holding that New Mexico statute criminalizing the dissemination by computer of material harmful to minors "represents an attempt to regulate interstate conduct occurring outside [the state's] borders," thus violating the Commerce Clause).

11, 2004) (Arizona), *Southeast Booksellers v. Ass'n v. McMaster*, 282 F. Supp. 2d 389 (D.S.C. 2003) (South Carolina), *American Library Association v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997) (New York).

Utah's latest effort reflects the early wave of another swell of substantially similar bills working through state legislatures around the country. *See, e.g.,* Louisiana H.B. 142 (effective Jan. 1, 2023); Mississippi S.B. 2346 (effective July 1, 2023); Arkansas S.B. 66 (effective July 31, 2023); Montana S.B. 544 (passed house); Texas S.B. 2021 (passed committee). Shockingly, it does nothing to redress the many noted infirmities that led to COPA's demise at the federal level. In some respects, Utah has made them worse.

## IV.    ARGUMENT

### 1.    Legal standards governing issuance of a preliminary injunction.

"To succeed on a typical preliminary-injunction motion, the moving party needs to prove four things: (1) that she's substantially likely to succeed on the merits, (2) that she'll suffer irreparable injury if the court denies the injunction, (3) that her threatened injury (without the injunction) outweighs the opposing party's under the injunction, and (4) that the injunction isn't adverse to the public interest." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado,* 916 F.3d 792, 797 (10th Cir. 2019) (internal quotation marks omitted). Because the Act imposes content-based restrictions on Plaintiffs' speech, Defendants bear the ultimate burden of proving the Act constitutional. *See, e.g., United States v. Playboy Entm't Grp., Inc.,* 529 U.S. 803, 813, 816-17 (2000).

Plaintiffs are entitled to a preliminary injunction in this case. They have a strong likelihood of success on the merits, as the Act restricts constitutionally protected content in a manner that is woefully ineffective, poorly tailored to the State's interest, overbroad, vague, and disruptive to interstate commerce. So, too, will they suffer irreparable injury absent the grant of

an injunction, as they'll face the untenable choice between ruinous tort liability and statutory compliance at great expense and sacrifice of constitutional freedoms. The balance of equities tips heavily in favor of granting the injunction, which—because it will vindicate constitutional rights—will serve the public interest rather than frustrate it.

2. **Plaintiffs are substantially likely to prevail on the merits.**

The Act imposes a clear violation of Plaintiffs' rights under the First and Fourteenth Amendments to, and the Commerce Clause of, the United States Constitution. Much of the Act is warmed over from previous efforts to restrict online content, which the Supreme Court, federal appellate courts, and state supreme courts all have roundly criticized.

A. **The Act is a content-based regulation of speech that cannot survive strict scrutiny, as the First Amendment demands.**

The Act imposes substantial burdens on content providers that want to publish constitutionally-protected materials on the internet. It precludes older minors from accessing important information about sex and sexuality at a time in their lives when they need it most. And it sweeps within its ambit a large swath of content published by pornographic and *non-pornographic* websites alike that adults have a First Amendment right to share and receive without state interference. *See Reno v. ACLU*, 521 U.S. 844, 874-75 (1997) (recognizing that "sexual expression which is indecent but not obscene is protected by the First Amendment" and that the government cannot pursue its interest in protecting minors through an "unnecessarily broad suppression of speech addressed to adults").

As a content-based restriction on protected, non-obscene speech, the Act is "presumptively invalid, and the Government bears the burden to rebut that presumption." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (internal quotation marks omitted). To endure, the Act must survive strict scrutiny—meaning it must: (1) serve a compelling governmental interest,

(2) be narrowly tailored to achieve that interest, and (3) be the least restrictive means of advancing that interest. *Sable Commc'ns of Cal., Inc. v. Fed. Commc'ns Comm'n*, 492 U.S. 115, 126 (1989).

Plaintiffs acknowledge that Utah has a compelling interest in protecting minors from exposure to harmful material on the internet. *See id.* ("[T]here is a compelling interest in protecting the physical and psychological well-being of minors[.]"). But the Act fails to withstand strict scrutiny because it is neither narrowly tailored to achieve the State's interest nor the least restrictive means of doing so. At state and federal levels, laws containing content-based restrictions on internet communications deemed harmful to minors have been held unconstitutional. *See infra* at 6-12. In enacting the Act, Utah has not learned its lessons from the past.

i.     The Act is not narrowly tailored to serve Utah's interest

Most of the Act's definition of "material harmful to minors" was pulled verbatim from challenged sections of COPA that the district court for the Eastern District of Pennsylvania, Third Circuit, and Supreme Court declared unconstitutional. The Utah legislature did not so much as attempt to revise these definitions to save them from constitutional challenge, and there has been no intervening legal development to shield them today from the same arguments that carried the day two decades ago.

The Act is poorly tailored in at least the following respects:

a.   *"As a whole"*

COPA defined material "harmful to minors" as that which:

> (A) the average person, applying contemporary community standards, would find, taking the material <u>as a whole</u> and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest; (B) depicts, describes, or represents, in a manner patently offensive with

respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and (C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

*ACLU v. Mukasey*, 534 F.3d at 191 (citing 47 U.S.C. § 231(e)(6)) (emphasis added). As the

Third Circuit recognized,

> when contemporary community standards are applied to the Internet, which does not permit speakers or exhibitors to limit their speech or exhibits geographically, the statute effectively limits the range of permissible material under the statute to that which is deemed acceptable only by the most puritanical communities. This limitation by definition burdens speech otherwise protected under the First Amendment for adults as well as for minors living in more tolerant settings.
>
> This burden becomes even more troublesome when those evaluating questionable material consider it "as a whole" in judging its appeal to minors' prurient interests. As Justice Kennedy suggested in his concurring opinion [in *Ashcroft v. ACLU*, 535 U.S. 564, 599 (2002)], it is "essential to answer the vexing question of what it means to evaluate Internet material 'as a whole,' when everything on the Web is connected to everything else."

*ACLU v. Ashcroft*, 322 F.3d at 253.

Although COPA did not define what, exactly, constituted the "whole" to be judged, the definition's reference to "*any* communication, picture, image file, article, recording, writing, or other matter of any kind" that satisfies the three prongs of the "harmful to minors" test led the Third Circuit to conclude that the statute "mandates evaluation of an exhibit on the Internet in isolation, rather than in context"—which "surely fails to meet the strictures of the First Amendment." *Id.* at 252–53 (noting that "one sexual image, which COPA may proscribe as harmful material, might not be deemed to appeal to the prurient interest of minors if it were to be viewed in the context of an entire collection of Renaissance artwork"); *see also Ashcroft v. Free Speech Coalition,* 535 U.S. 234 (2002) ("[It is] an essential First Amendment rule [that t]he artistic merit of a work does not depend on the presence of a single explicit scene.").

The Utah Act is virtually identical in relevant respects—including its resort to parts (A) and (C) of the "harmful to minors" definition outlined above, and its failure to define "as a whole" while including, as "material harmful to minors," "*any* material" that meets the modified-for-minors *Miller* Test. *See* Utah Code Ann. § 78B-3-1001(5) (emphasis added). Just as COPA failed to satisfy the First Amendment by "mandate[ing] evaluation of an exhibit on the Internet in isolation, rather than in context," so does the Utah Act.

The Utah legislature had two decades to study the history and tinker with its definition to pass constitutional muster. But it just copied Louisiana's homework instead, leaving Plaintiffs and others scratching their heads. *See* Pfeuffer Decl. ¶ 7, Dawson Decl. ¶ 7, Ford Decl. ¶ 20.

b.   *"Minor"*

The Supreme Court has strongly suggested that "modified for minors" obscenity regulations are unlikely to survive First Amendment scrutiny if they do not exempt older minors. *See Reno v. ACLU*, 521 U.S. 844, 865–66 (1997) (distinguishing the "junior obscenity" statute upheld in *Ginsberg* from the unconstitutional regulation before the Court on the basis that, among other things, the former exempted 17-year-olds, whereas the latter did not); *see also American Booksellers Foundation v. Webb*, 919 F.2d 1493, 1505 (11th Cir. 1990) ("*Pope* [*v. Illinois*, 481 U.S. 497 (1987)] teaches that if any reasonable minor, including a seventeen-year-old, would find serious value, the material is not 'harmful to minors.'"). COPA defined "minor" as "any person under 17 years of age"—prompting the Third Circuit to quip that it "need not suggest how the statute's targeted population could be more narrowly defined, because even the Government does not argue, as it could not, that materials that have 'serious literary, artistic, political or scientific value' for a sixteen-year-old would have the same value for a minor who is three years old." *ACLU v. Ashcroft*, 322 F.3d at 253-54. The court concluded that "[e]ven if the

statutory meaning of 'minor' were limited to minors between the ages of thirteen and seventeen, Web publishers would still face too much uncertitude as to the nature of material that COPA proscribes." *Id.* at 255. For that reason alone, the statute was reasoned to be unconstitutional. *See also ACLU v. Mukasey,* 534 F.3d at 193 ("Our prior decision [in *ACLU v. Ashcroft*] is binding on these issues on this appeal.").

Miraculously, rather than whittling down COPA's definition of "minor," the Utah legislature *broadened* it to include seventeen-year-olds—an age group more developed in its sensibilities and more burdened by a blanket definition that judges the "literary, artistic, political, or scientific value" *not* by reference to other seventeen-year-olds, but to the broader (and younger) group of all "minors." The result is the restriction of material appropriate (and in some cases, critical) to an older teen's self-discovery in matters as elemental as sexual expression, sexual orientation, gender identity. *See* Barrica Decl. ¶¶ 8-9. Again, the Utah legislature had more than two decades to tinker with its definition to pass constitutional muster. Again, it failed to do so.

### c.   *"Substantial portion"*

Because the Act requires age-verification in order to access only those websites that offer "material harmful to minors" as a "substantial portion" of total content (defined as one-third or more), minors will face no impediment to obtaining such material from websites watered down—either incidentally or purposefully in order to avoid the consequences of the Act— with other content unoffensive to the sensibilities of the Utah legislature. Thus, given enough non-"harmful" material on a single site, even the providers of material that is "harmful to minors" under *any* definition will earn a pass under the Act. At the same time, the Act seeks to preclude

minors from accessing even those websites offering mostly anodyne content when one-third of the site's material crosses the threshold into might be construed as "harmful to minors."

Illogical results flowing from poorly conceived statutes usually cause little constitutional concern, but the First Amendment demands greater precision. No content-based restriction on speech that would afford minors access to websites featuring hardcore pornography diluted sufficiently with Sesame Street videos, while denying access to websites (like O.school) offering a fulsome and honest sexual education, can survive strict scrutiny. Even less so when the statute offers no guidance as to whether total content is determined according to bytes of material, number of web pages, seconds of video, words of a sexual nature, or some other metric entirely. *See* Pfeuffer Decl. ¶ 7, Dawson Decl. ¶ 7, Ford Decl. ¶ 20.

    *d.   "Commercial entity" and "website"*

The Act foists liability upon any "commercial entity" that distributes material harmful to minors "from a website" containing a substantial amount of such material if *that entity* fails to perform qualifying age-verification checks. Because a "commercial entity" includes every "legally recognized entit[y]" from the largest corporation down to the smallest "sole proprietorship" (created by default when setting up a business[5]), the Act (intentionally or

---

[5] As explained by the Utah Division of Corporations and Commercial Code:
> [A] sole proprietorship is formed very easily and inexpensively A person need merely set up his business to establish a sole proprietorship. No formalities are necessary. He may have a sole proprietorship even though he does not intend to create one. . . . By default then, a person going into business by himself automatically creates a sole proprietorship when he fails to choose another business form."

*Available at* https://corporations.utah.gov/business-entities/considerations-in-forming-a-sole-proprietorship/.

otherwise) requires individual performers to implement their own age-verification protocols even when relying on another company's platform to host their content. The cost placed on individual performers to meet the dictates of the Act is more than they can feasibly bear while continuing to operate at a profit. *See* Pfeuffer Decl. ¶ 9. By imposing the burden on the performer rather than (or in addition to) the platform operator, Utah has chosen an inefficient and cost-prohibitive means of effecting its interest.

Compounding the problem is the lack of precision as to what constitutes a "website" in the first place. In its simplest form, a website *can* mean a series of connected pages under a single domain name. Often, however, webpages have more complicated structures, sometimes involving multiple domain names or subdomains. *See* Pfeuffer Decl. ¶ 7, Ford Decl. ¶¶ 18-19. Some webpages might link to separate but related businesses, and others might be simple clearing houses linking to content living on different servers. For the operator of a platform (like Plaintiff JFF) that hosts the content of myriad individual performers, defining the bounds of the "website" is critical. Likewise for a content creator (like Plaintiff Pfeuffer) who archives her writings on a publicly accessible site that is itself a subdomain of another site to which she does not control user access. *See* Pfeuffer Decl. ¶¶ 5,7. But in failing to define "website," the Act may capture far more speech than is ostensibly intended, and certainly more than is constitutional. *Cf. ACLU v. Gonzales*, 478 F. Supp. 2d at 817 (E.D. Pa. 2007) ("[A]lthough Congress intended COPA to apply solely to commercial pornographers . . . the phrase 'communication for commercial purposes', as it is modified by the phrase 'engaged in the business,' does not limit COPA's application to commercial pornographers. The lack of clarity in these phrases results in Web sites, which only receive revenue from advertising or which generate profit for their owners only indirectly, from being included in COPA's reach.").

*e.   Chill on adult speech*

The Third Circuit acknowledged that COPA would "deter many adults from accessing restricted content, because many Web users are simply unwilling to provide identification information in order to gain access to content, especially where the information they wish to access is sensitive or controversial." *ACLU v. Ashcroft*, 322 F.3d at 259 ("People may fear to transmit their personal information, and may also fear that their personal, identifying information will be collected and stored in the records of various Web sites or providers of adult identification numbers."). *See also* Doe Decl. ¶ 7. Again and again, the Supreme Court has disapproved of content-based restrictions that require recipients to identify themselves before receiving access to disfavored speech, given the chilling effect on those putative recipients.[6] *See, e.g.*, *Lamont v. Postmaster General*, 381 U.S. 301 (1965) (holding that federal statute requiring Postmaster to halt delivery of communist propaganda unless affirmatively requested by addressee violated First Amendment); *Denver Area Educ. Telecomms. Consortium v. FCC*, 518 U.S. 727, 732–33 (1996) (holding unconstitutional a federal law requiring cable operators to allow access to sexually explicit programming only to those subscribers who request access to the programming in advance and in writing).

Here, Utah failed even to provide meaningful guideposts for what age-verification methods would prove "reasonable," thereby driving content producers from the marketplace— including Plaintiff JFF. *See* Ford Decl. ¶¶ 12-14; *see also* Barrica Decl. ¶ 10. Yet the few indications Utah *did* provide all seem to require not just verification of the user's age, but the

---

[6] Requiring internet users to present identification as a condition of access imposes a substantially greater intrusion than does a prove-your-age requirement of a patron at a movie theater, liquor store, or adult bookstore. Unlike digital age verification over the internet, those latter "real world" visits leave no record (or risk of one) and affect only those who are plausibly under-age.

user's identity. *See* Utah Code Ann. § 78B-3-1001 (defining "reasonable age verification methods" to demand scrutiny of a "digitized identification card," confirmation of a user's personal information against a database used for "age <u>and</u> identity verification," or some other "commercially reasonable" use of a user's "transactional data") (emphasis added). Higher courts have already called out the lack of precision in this same statutory language and the same chill imposed by a condition requiring adults to identify themselves before receiving sexually explicit speech online. Utah did not so much as attempt to remedy these failings, leaving the Act as poorly tailored now as COPA was two decades ago. Judging from Senator McKell's comments on the Senate floor, that chill on adult speech seems to be the very point of this Act.

### f. Compelled speech

Cautious operators of even *non*-pornographic websites must place an age-verification content wall over their entire websites if they wish to continue communicating with Utah audiences without risking ruinous tort liability. Doing so necessarily labels them an adult business peddling "material harmful to minors"—the consequences of which can be dire, including not only declining internet traffic, but social stigma, lost ad revenue, and exclusion from public or private programs or curricula. Websites that process payments may lose the ability to accept major credit cards and be forced to use third-party billing companies that charge fees up to 15% of the purchase price (rather than the 3-5% typically charged by credit card companies). They also may face difficulty purchasing business liability insurance and hiring employees. *See* Ford Decl. ¶¶ 22-23.

Because the Act "compels speech in this case, it also works as a content-based restriction." *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1178 (10th Cir. 2021), *cert. granted in part*, 142 S. Ct. 1106 (2022) (applying strict scrutiny to Colorado's Anti-Discrimination Act).

Requiring website operators to self-identify in such manner shifts the burden of deciphering an indecipherable statute from the State to the regulated operator, thereby capturing the cautious site operators while exempting the most brazen until some private individual decides to sue. This is not the stuff of narrow tailoring, and by placing the onus on private parties to police themselves, the State has proven willing to tolerate a level of over- and under-inclusiveness that would be constitutionally problematic even if the Act were a paragon of clarity—which, of course, it isn't.

 ii. <u>The Act is not the least restrictive means of serving Utah's interest</u>

When it comes to content-based restrictions on speech, it is well established that "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy*, 529 U.S. at 813; *see also Reno v. ACLU*, 521 U.S. at 874 ("Th[e] burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose [of denying minors access to harmful content] that the statute was enacted to serve."); *Sable*, 492 U.S. at 126.

For decades now, courts have recognized the availability, affordability, and effectiveness of device-level blocking and filtering technologies that, as a parental option rather than a government mandate, pose no constitutional concerns. Faced with the argument that voluntary use of blocking and filtering software "places an onus on parents" who might not assume the mantle of responsibility, the Third Circuit was satisfied that the "Supreme Court has effectively answered this contention"—as a court must not assume "a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to

act." *ACLU v. Ashcroft,* 322 F.3d at 262 (quoting *Playboy*, 529 U.S. at 805).[7] Nor did arguments about the over- and under-inclusiveness of blocking and filtering programs convince the court that COPA presented the least restrictive *effective* means to prevent children from viewing harmful content online; although the court acknowledged that such programs "may sometimes block too little and sometimes block too much," it credited the district court's finding that such programs could prove *more* effective than site-level restrictions by reaching even "foreign [w]eb sites, noncommercial sites, and materials available online via protocols other than http" that were beyond the reach of site-level restrictions. *Id.* at 264. A later trial on the merits in the case created an exhaustive record detailing the many advantages that device-level filters have over restrictions imposed on the websites themselves. *See ACLU v. Gonzales*, 478 F. Supp. 2d at 789-97; *see also ACLU v. Mukasey*, 534 F.3d at 199-204 (reviewing and affirming district court's findings).

Utah's legislatively-imposed site-level restriction casts the same wide net that decades ago was found both too wide and too porous to withstand constitutional scrutiny. Since then, that net hasn't shrunk, and the holes have grown only wider. The recent proliferation of cheap VPN programs has given children with a modicum of tech-savvy and access to Google the ability to scramble their IP address to evade a state's site-level restrictions. Indeed, Utah residents *immediately* began using VPNs to circumvent the pornography blackout imposed by top

---

[7] The *Playboy* Court held unconstitutional a federal statutory provision that required cable operators who provide channels primarily dedicated to sexually-oriented programming to scramble or block those channels completely, or to "time channel" their transmission by limiting their availability to nighttime hours. The Court found this to be a "significant restriction of [protected] communication between speakers and willing adult listeners" that failed strict scrutiny because less restrictive means were available—an opt-out provision whereby a cable subscriber could request the cable company to scramble or block receipt of sexually explicit channels.

providers.[8] Moreover, accessing the dark web has become simpler than ever before, and site-level content restrictions risk diverting children to corners of the hidden internet that are *not* so restricted and which contain material far more harmful (and illegal) than what is available at an http. *See generally* Ahmed Ghappour, *Searching Places Unknown: Law Enforcement Jurisdiction on the Dark Web*, 69 Stan. L. Rev. 1075, 1087-90 (2017).

Meanwhile, in the years since COPA's constitutional challenge, device-level restrictions have improved dramatically. After a bench trial in the COPA litigation, the district court found that filtering technology can be calibrated to a particular child's age and sensitivity by the child's parents, and that filters, unlike site-level age screening, are "difficult for children to circumvent." *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 789 (E.D. Pa. 2007), *aff'd sub nom.*, *ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008). That technology has only improved in the intervening 15 years. So, too, has it proliferated. Today, many of these programs come preinstalled and ready to use from the moment a new computer or phone is purchased; others are free or inexpensive to download and highly customizable, offering benefits well beyond screening for sexual content. *See* Boden Decl. ¶¶ 10-15.

Utah of course could have created incentives and campaigned for the improvement and expanded use of content filters—as the Supreme Court has suggested. *See Ashcroft v. ACLU*, 542 U.S. at 670 ("Congress can give strong incentives to schools and libraries to use [device filters]. It could also take steps to promote their development by industry, and their use by parents. . . . By enacting programs to promote use of filtering software, Congress could give parents that

---

[8] *See* Christiano Lima, "Utah's porn crackdown has a VPN problem," Washington Post, May 5, 2023, *available at* https://www.washingtonpost.com/politics/2023/05/05/utahs-porn-crackdown-has-vpn-problem/.

ability without subjecting protected speech to severe penalties."). It hasn't done so—opting instead for a blanket restriction that, by imposing substantial costs on content providers, reveals the State's true intention of stifling disfavored speech. *See* Ford Decl. ¶¶ 12-14, Barrica Decl. ¶ 10. *See also ACLU v. Mukasey*, 534 F.3d at 195 (suggesting that weaknesses of site-level restrictions, compared against device-level filters, "might raise the inference that Congress had some ulterior, impermissible motive for passing COPA").

"Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *Elrod v. Burns*, 427 U.S. 347, 363 (1976). Here, that precision is woefully lacking, leaving Defendants with no serious argument that the Act may survive strict scrutiny.

### B.  The Act is both constitutionally overbroad and vague.

A statute that burdens otherwise protected speech is facially invalid when that burden is not only real, but "substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). Put another way, the overbreadth doctrine prohibits the Government from restricting even *unprotected* speech where "a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. at 237. An overbreadth analysis often engages in the same questions as the narrow tailoring prong of a strict scrutiny analysis. *See ACLU v. Ashcroft*, 322 F.3d at 266 ("Overbreadth analysis—like the question whether a statute is narrowly tailored to serve a compelling governmental interest—examines whether a statute encroaches upon speech in a constitutionally overinclusive manner.").

So, too, may overbreadth challenges overlap substantially with Fourteenth Amendment void-for-vagueness challenges. *See Kolender v. Lawson*, 461 U.S. 352, 358 n. 8 (1983) ("[W]e have traditionally viewed vagueness and overbreadth as logically related and similar doctrines.").

A statute is void for vagueness if it "forbids . . . the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Constr. Co*., 269 U.S. 385, 391 (1926); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."). "[S]tandards of permissible statutory vagueness are strict in the area of free expression," and the "Court has not hesitated to take into account possible applications of the statute in other factual contexts besides that at bar." *NAACP v. Button*, 371 U.S. 415, 432 (1963); *see also Reno v. ACLU*, 521 U.S. at 871–72 (1997) (where the vagueness arises amidst a "content-based regulation of speech[,] the vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech").

The Utah Act is both substantially overbroad and unconstitutionally vague in myriad respects. As discussed *supra*, the phrase "taken as a whole" in the definition of "material harmful to minors" does not explain how the "whole" is to be judged. Should one consider only a specific article, certain text, or an individual image on a website? Or should one consider the web page on which that text or image appears? Or the entire website? And should one include linked material? As "any material" meeting the modified-for-minors *Miller* Test is deemed "harmful to minors" under the Act, what then constitutes a discrete and divisible item of "material"? The phrase "substantial portion," defined as "more than 33-1/3% of total material on a website," likewise fails to explain how "total material" is calculated. Is it by the volume of data? The number of posts? What is the proper metric to measure? Gigabytes? Character count? Number of images? Video runtime? And what about linked material? May a website avoid the problem altogether by providing a link to all the innocuous content in the local public library? These

ambiguities have led to confusion among the Plaintiffs and fear of liability from noncompliance with the Act. *See* Pfeuffer Decl. ¶ 7, Dawson Decl. ¶ 7, Ford Decl. ¶ 20.

The term "minor," defined as "any person under 18 years old," is vague insofar as it fails to designate the whole from which a content provider must ascertain the average. Whether material is designed to appeal to the prurient interest, is presented in a "patently offensive manner," or lacks serious literary, artistic, political, or scientific value is determined with respect to minors. But does this "minor" refer to some hypothetical pre-teen reflecting the median sensibility across *all* minors, from infants to high school seniors? Or some other person occupying some other position on the maturity spectrum? To the extent that older minors are shut out from accessing critical, age-appropriate content, the definition is substantially overbroad (and potentially dangerous). *See* Barrica Decl. ¶¶ 8-9.

The terms "commercial entity" and "website" are overbroad and vague to the extent that the former might capture performers publishing content on another company's platform, while the latter could be read to capture just about anything on the internet—from a performer's channel hosted on another platform, to the skeleton of that platform, to the entire contents of that platform and even *other* platforms housed on the same servers and sharing the same code. *See* Ford Decl. ¶¶ 18-19, Pfeuffer Decl. ¶ 7, Dawson Decl. ¶ 7.

The statutory catch-all in the Act's safe harbor provision permits "any commercially reasonable method that relies on public or private transactional data" as a means of verifying a user's age but provides no guideposts whatsoever as to what "commercially reasonable" demands. *See* Ford Decl. ¶ 21, Barrica Decl. ¶ 10, Pfeuffer Decl. ¶ 9, Dawson Decl. ¶ 7.

Reference to "contemporary community standards" is vague and overbroad due to the borderless nature of the internet. Utah is a diverse state, and the "contemporary community standards" vary widely from Park City to Provo, but when a content provider publishes material

on a website, the same material is made available in *every* Utah county. To avoid running afoul of the Act, websites must abide by a "most prudish community" standard—restricting (in the case of minors) or chilling (in the case of adults) substantial quantities of constitutionally protected content.

Finally, it is unclear what, exactly, a commercial entity must "know" or "intend" to be liable under the Act. Must the entity merely intend to publish or distribute material that, incidentally, happens to fit the statutory definition of "material harmful to minors?" Must the entity *know* that the published material meets that definition? Must it know that the publishing website's offerings, as a whole, contain at least one-third such material? The question is of particular salience to commercial entities that publish or distribute materials on websites owned and operated by *other* commercial entities—potentially tasking the former with a duty to inventory the full array of materials offered by the latter.

By placing significant burdens on web publishers' ability to disseminate protected speech and web users' ability to receive it, the Act encroaches upon a significant amount of protected speech beyond that which Utah may target constitutionally to prevent minors' access to sexual material. *See Ginsberg*, 390 U.S. at 639–43; *Sable*, 492 U.S. at 126; *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–14 (1975). And by placing so much of the operative language beyond the ability of a trained attorney (never mind an average person) to understand, the Act is unconstitutionally vague, as well. *See Connally*, 269 U.S. at 391; *Reno v. ACLU*, 521 U.S. at 871–72.

### C.  The Act violates the Commerce Clause.

The Act violates the Commerce Clause because it regulates strictly out-of-state conduct, places burdens on interstate commerce that clearly outweigh its illusory local benefits, and legislates a critical instrumentality of commerce that demands uniform regulation.

### i.     The Act impermissibly regulates the activities of out-of-state websites.

The Act burdens interstate commerce by impinging on communication occurring outside Utah's borders. Unlike, say, pork produced according to animal husbandry practices that violate the standards of another state where it is sold, *see Nat'l Pork Prods. Council v. Ross,* 598 U. S. ____ (2023), content published over the internet *automatically* reaches internet-enabled computers in all 50 states and requires affirmative and costly steps by the website operator to limit its geographic reach. *See ACLU v. Johnson*, 194 F.3d 1149, 1161 (10th Cir. 1999) (holding that New Mexico statute criminalizing the dissemination by computer of material harmful to minors "represents an attempt to regulate interstate conduct occurring outside [the state's] borders," thus violating the Commerce Clause). The Act thus "has the practical effect of . . . control[ling] conduct beyond the boundaries of the State." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989).

### ii.    The Act's burdens on interstate commerce clearly outweigh any local benefits.

Even if the Act were not a direct regulation of out-of-state conduct, it would still run afoul of the Commerce Clause by imposing burdens on interstate commerce that are "clearly excessive" in relation to its local benefits. *See Pike v. Bruce Church, Inc*., 397 U.S. 137, 142 (1970); *see also Johnson*, 194 F.3d at 1162 ("New Mexico's prosecution of parties from out of state who have allegedly violated [the ban on internet dissemination of "harmful to minors" material], but whose only contact with New Mexico occurs via the Internet, is beset with

practical difficulties, even if New Mexico is able to exercise criminal jurisdiction over such parties.") (brackets omitted).

    iii.    <u>The Act creates inconsistent regulation of the internet.</u>

The Act also violates the long-established rule barring states from enacting differing standards for instrumentalities of national commerce where uniformity is required. *See Johnson*, 194 F.3d at 1162 ("[C]ertain types of commerce have been recognized as requiring national regulation. The Internet is surely such a medium."); *see id.* at 1161 ("The unique nature of the Internet highlights the likelihood that a single actor might be subject to haphazard, uncoordinated, and even outright inconsistent regulation by states that the actor never intended to reach and possibly was unaware were being accessed.") (quoting *American Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 168–69 (S.D.N.Y.1997)).

Even to the extent that the Supreme Court's recent decision in *Nat'l Pork Prods. Council v. Ross* read *Pike* narrowly, it reaffirmed the line of cases "in which th[e] Court refused to enforce certain state regulations on instrumentalities of interstate transportation—trucks, trains, and the like." 598 U. S. ____ (2023), Slip Copy at 17-18 n.2 (citing *Bibb* v. *Navajo Freight Lines, Inc.*, 359 U. S. 520, 523–530 (1959) (mud flaps for trucks and trailers) and *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761, 763–782 (1945) (length of trains)). The dormant aspect of the Commerce Clause shows its teeth when "a lack of national uniformity would impede the flow of interstate goods." *Id.* (quoting *Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117, 128 (1978)). And while "[p]igs are not trucks or trains," *see id.*, the internet is precisely the type of instrumentality of commerce that demands uniform regulation of materials published thereon.

The threat of inconsistent regulation is clear and present. The Utah Act is modeled after Louisiana's H.B. 142 (effective Jan. 1, 2023) and precedes the effective date of other similar state laws that either have been enacted, *see* Mississippi S.B. 2346 (effective July 1, 2023); Arkansas S.B. 66 (effective July 31, 2023), or seem likely to be, *see, e.g.,* Montana S.B. 544 (passed house); Texas S.B. 2021 (passed committee). If the Utah Act is permitted to stand, then publishers of internet content will have to navigate a morass of differing legal standards, "community standards," digitized identification cards, and approved technologies and protocols for age-verifying. *Cf. Stevens*, 559 U.S. at 476 ("Those seeking to comply with the law . . . face a bewildering maze of regulations from at least 56 separate jurisdictions."). Disparate regulation of erotic material is just the canary in the coal mine; a patchwork of state-by-state regulation of this sort threatens the internet as we know it.

### 3. Plaintiffs are likely to suffer irreparable injury absent imposition of the injunction.

"What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial." *Free the Nipple*, 916 F.3d at 806. As "[a]ny deprivation of any constitutional right fits that bill[,] . . . courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury." *Id.* at 805-06 (citing *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012)); *see also Heideman v. South Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003) (requiring dancers to wear pasties and G-strings while challenging an ordinance banning nudity within sexually-oriented businesses was a sufficient loss of First Amendment freedom to constitute irreparable harm for the purposes of their application for preliminary injunctive relief); *accord Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

### 4. The balance of harms tilts toward Plaintiffs.

"[W]hen the law that voters wish to enact is likely unconstitutional, their interests do not outweigh [a plaintiff's] in having his constitutional rights protected." *Awad*, 670 F.3d at 1131. Indeed, "when a constitutional right hangs in the balance, . . . even a temporary loss usually trumps any harm to the defendant." *Free the Nipple*, 916 F.3d at 806 (noting that "being required to wait to bare their breasts in public" deprives the Plaintiffs of a constitutional right, while the City has no interest in keeping an unconstitutional law on the books"); *accord* Wright & Miller, FED PRAC. & PROC. § 2948.2.

For the reasons discussed *supra*, Plaintiffs are incurring constitutional injury every day the Act remains in effect; the State of Utah, meanwhile, has no legitimate interest in the enforcement of a patently unconstitutional statute that has been in effect for just a few weeks.

### 5. An injunction is not adverse to the public interest.

The Tenth Circuit has acknowledged that it is "always in the public interest to prevent the violation of a party's constitutional rights." *Free the Nipple*, 237 F.Supp.3d at 1134; *see also Cate v. Oldham*, 707 F.2d 1176, 1190 (10th Cir. 1983) (noting the "strong public interest in protecting First Amendment values").

The Act is a poorly crafted solution to a poorly articulated problem, and the public interest is not advanced by the endurance of an overly restrictive, vague, and overbroad statute that imperils the rights of Utahns to provide and receive constitutionally-protected material over the internet.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask this Court to enjoin enforcement of the Act pending the final determination of this action.

Respectfully Submitted,

By      /s/ Jeffrey Sandman

Date: May 31, 2023

_____

Jeffrey Sandman (*pro hac vice*)
WEBB DANIEL FRIEDLANDER LLP

D. Gill Sperlein (*pro hac vice*)
The Law Office of D. Gill Sperlein

Jerome Mooney
Weston, Garrou & Mooney

Attorneys for Plaintiffs